## *RUNDLE *v.* MURGATROYD's assignees.

### *Bankruptcy.*

Under the bankrupt law of 1800, a mortgage given by an insolvent, to secure a legacy bequeathed to his wife, which he had received and used in his business, is void, as against the assignee, though executed in pursuance of a previous agreement to secure the legacy, in case of insolvency.

THE point agitated upon the trial of this cause, turned on the validity of a mortgage given to the plaintiff by *Murgatroyd*, to secure to his wife, the amount of a legacy which had been bequeathed to her, by her grandmother. It appeared, that in the year 1784, *Murgatroyd* had entered into articles of agreement with trustees, by which he engaged to secure the legacy, in case he should become insolvent. He received the money, and mixed it with his other pecuniary funds; but took no steps to secure the amount for his wife, until the execution of the present mortgage, in *March* 1802, when he was insolvent, and was soon afterwards duly declared a bankrupt. The case was considered, as a case of marriage settlement, by the counsel on both sides.

In *support* of the settlement, the following authorities were cited : 6 T. R. 154 ; 2 Bos. & Pul. 582 ; 6 T. R. 80 ; 2 Atk. 558 ; 1 Ibid. 192; 1 P. Wms. 459 ; 2 Dall. 199.

In *opposition* to the settlement were cited : 1 Fonbl. 271, 272 ; 2 Atk. 480–1 ; 8 T. R. 82.

SHIPPEN, Chief Justice.—The mortgage given by *Murgatroyd* is resisted on behalf of his creditors, upon the general ground, that it was given in contemplation of bankruptcy. There is but one exception to the rule, which declares a conveyance so given to be void ; namely, where a creditor obtains a preference, by urging his debtor for payment, and threatening him with legal process. The only question, therefore, is a matter of fact, whether *Murgatroyd*, at the execution of the mortgage, contemplated bankruptcy, and meant voluntarily to prefer the particular creditor ? If the evidence proves the affirmative, the mortgage is void; but if otherwise, it is lawful and valid.

It has been urged, in favor of the plaintiff's claim, that whatever may have been the situation of *Murgatroyd*, at the time of executing the mortgage, the act was done in pursuance of a previous agreement, entered into for a valuable consideration, when he was perfectly solvent. It would be grateful to our feelings, on the present occasion, could we express sentiments favorable to the maintenance and fortunes of a wife and children; but we cannot seek that gratification, through a sacrifice of the established principles of law. The agreement was executory ; and although it had relation to a possible insolvency, it might, perhaps, independent of the bankrupt law, have been carried into effect. But no antecedent contract can make the mortgage valid, upon the provisions and principles of the bankrupt law, if *Murgatroyd* *actually gave it, when he was insolvent, upon the eve of a legal bankruptcy. The general creditors had then acquired an interest in his estate; and it was too late to perform an engagement for giving preferences and securities, at their expense, to any particular creditor.

The law respecting marriage settlements, is the same in *England* and in *Pennsylvania*. It requires a fair motive, as well as a valuable considera-

Rundle v. Murgatroyd.

tion ; and the interest must be actually declared and vested, at the time of a settlement, or it cannot prevail against the rights of honest creditors.

The present case by no means resembles the case of *General Stewart's* settlement. There, Mr. McClenachan, on his daughter's marriage, delivered to General Stewart a large sum, in certificates of public debt, expressly stipulating, that those certificates should be held and appropriated to the use of Mrs. Stewart and the children of the marriage. General Stewart always kept the fund represented by the certificates, distinct from his own immediate funds ; and although he subscribed them, first to the new loan of Pennsylvania, and afterwards, to the general loan of the United States, constituting the funding system, it was traced, and ascertained that the real estate specified in the deed of settlement (which, it is true, was made long after the marriage) had been, in fact, purchased with the actual proceeds of the original certificates, delivered by Mr. McClenachan upon the marriage. But here, the bequest of the legacy was made without stipulation, or condition ; the money being received by Murgatroyd, was blended with his other property, so that a separate existence or application could never be traced ; and, under these circumstances, he acquired a credit, which would be false and delusive indeed, were the property now withdrawn, upon an obsolete and latent pretence, from the creditors who trusted to it.

SMITH, Justice.—I am likewise of opinion, that the mortgage must yield to the superior legal and equitable claims of the general creditors. It is a sound and uniform rule, that settlements made upon a wife and children, by persons who have not a sufficient estate to pay all their debts, are void against creditors. The decision upon *General Stewart's* settlement was not a departure from the rule ; but simply a recognition of the marriage portion of Mrs. Stewart, transformed and ascertained in a new shape. The late, as well as the present chief justice and myself, delivered our opinions at large in that case ; and united in the result, for the reasons that have been suggested ; none of which can be assigned in favor of the present claim, under the mortgage.[1]

The jury, according to the charge, found a verdict for the defendant. (a)

*Rawle* and ——, for plaintiff ; *Ingersoll* and *Tilghman*, for defendant.

---

(a) The validity of General Stewart's settlement was tried in December term 1799, in an amicable ejectment brought by Blanchard's Lessee *v.* Ingersoll. The facts proved upon the the trial may be reduced to the following case:

\* On the marriage of General Stewart with the daughter of Mr. McClenachan, [\*306] in the year 1781, he received, in real and personal estate, a portion of 40,000*l.* Pennsylvania currency ; of which loan-office certificates, for money loaned by Mr. McClenachan in 1777, constituted about a moiety, bearing interest at six per cent. per annum. In delivering the certificates, Mr. McClenachan told General Stewart, "that he might use the interest, but that the principal of the certificates should be settled on

---

[1] So long as trust property can be traced and distinguished, it is liable to the claim of the *cestui que trust ;* but the right of reclamation is at an end, when the subject-matter has been converted into money, and mixed with other funds. Thompson's Appeal, 22 Penn. St. 16 ; s. p Reed's Appeal, 34 Id 207 ; Robb's Appeal, 41 Id. 45 ; Keener *v.* Cross, 65 Id. 303. See Kepler *v.* Kepler, 80 Id. 153. Equity will follow a trust fund through every transmutation, if the rights of a *bonâ fide* purchaser, without notice, do not intervene. Sadler's Appeal, 87 Penn St. 154.

Rundle v. Murgatroyd.

his wife and children, and appropriated sacredly to their exclusive use and benefit;" and General Stewart promised expressly to make the stipulated settlement and appropriation. Soon afterwards, General Stewart entered into partnership with Mr. A. Nesbit, and prosecuted an extensive scene of commerce, upon funds chiefly furnished by Mr. McClenachan. In the year 1785, General Stewart went to England, leaving the certificates in the hands of his partner (with whom they had been specifically deposited several years before), and taking a written receipt and promise, to return them to him, or to his order, on demand. While in England, he made a will, dated the 7th of October 1787, which bequeathed the certificates to his wife and children, but did not refer to any previous agreement or promise to do so. He returned to America in 1787, and soon afterwards, assigned the certificates in trust to Mr. McClenachan and his partner, for the use of his wife and children, by a deed dated the 9th of June 1788; which was also silent as to any previous agreement upon the subject; but referred to the will of 1787, or any other last will which he might make, for the apportionment of the fund. The certificates were subscribed to the new loan of Pennsylvania; but were re-exchanged, and finally subscribed to the loan of the United States. The public stock having risen to its full nominal value, General Stewart proposed to Mr. McClenachan (Mr. Nesbit being dead), to sell it, and vest the proceeds in houses and city lots, as offering a better speculation; to which Mr. McClenachan assented, upon the original principle, that the investment should be for the use and benefit of General Stewart's wife and children. The stock was, accordingly, sold and transferred, between June 1791 and April 1792; and the property in question was purchased, between March 1792 and February 1793, to the value of about $25,000. On the 20th of May 1793, General Stewart executed a deed, before two witnesses, conveying this property to Mr. McClenachan, and his son, George McClenachan, in trust; and after reciting the deed of trust of 1787, the subsequent sale of the certificates, the investment of the proceeds, and the intention that the real estate shall be held to the same uses as the certificates, according to the apportionment of the will of 1787, or such other last will, as General Stewart might make, it concluded with reserving a power of revocation, by consent of both parties, to sell the trust estate, and to invest the proceeds in other funds, but in the name of the same trustees, and for the same uses. The deed being executed, General Stewart delivered it to Mr. McClenachan, who deposited it for safe-keeping (as he resided in the country), with other valuable papers belonging to himself, in an iron chest, kept by General Stewart in his counting-house. General Stewart died on the 14th of June 1796, having, a few hours previously, made a will devising and bequeathing all his estate, real and personal, with a power to sell and convey, for the payment of his debts, and constituting Mrs. Stewart an executrix, and Messrs. McClenachan, W. Tilghman and F. West, executors, without referring to the deed of settlement, or any previous agreement upon the subject. In May 1793, and at the time of his death, he was generally supposed to be in affluent circumstances; but about four months after his death, a contrary suspicion arose, which subsequent events confirmed. In taking the inventory of his effects, the deed of settlement was found; but the executors regarded it as incomplete and invalid. While, too, the executors thought the estate rich, Mr. McClenahan himself requested that the deed should be laid aside; and he and Mrs. Stewart joined the other executors in selling and conveying part of the trust property, for the payment of debts, under the power given in the will of 1796. The failure of Morris & Nicholson's notes (in which General Stewart and Mr. McClenachan had speculated largely), and other disappointments, proved fatal to the estate; and it was even ascertained that, on a fair estimate, the general balance of General Stewart's account of property and debts was against him, at the time that he executed the deed of *307] 1793: but on the other hand, he was clearly solvent *when he executed the deed of 1788. Under these circumstances, Mrs. Stewart consulted her counsel on the validity of the deed of 1793, representing all the previous facts (which had not been adverted to, while General Stewart's estate was thought solvent), and was advised to prove and record it. This was done, on the 27th of February 1797, before any judgment had been obtained against General Stewart; and the trustees having surrendered and assigned

Rundle v. Murgatroyd.

the trust estate to Mr. Ingersoll, in June 1797, an amicable ejectment was instituted, for the purpose of settling the conflicting claims of the widow and the creditors.

The counsel for Mrs. Stewart ( *W. Tilghman, Lewis, Ingersoll* and *Dallas*) contended, that marriage was in itself a valuable consideration, to entitle the wife to a provision even out of her husband's estate, independent of her own ; that a voluntary settlement after marriage, by a husband, not indebted, is valid, with or without a consideration on the part of the wife, against all subsequent creditors ; that an agreement for a settlement, made in writing, before and in contemplation of marriage, will always be carried into effect ; that a parol promise of a settlement, made before and in contemplation of marriage, is equally valid in Pennsylvania, although the law upon the subject has been altered in England, by an act of parliament ; and that even where there is no previous agreement between the parties, a court of equity will never grant a wife's personal property to her husband, until he has made an adequate settlement upon her. As to the facts of the present case, it was argued, 1st. That before the marriage, a contract was entered into between Mr. McClenachan and General Stewart, *bonâ fide,* and upon a valuable consideration. 2d. That the settlement now controverted, was made in pursuance of that contract, from the proceeds of the certificates, specifically traced, which constituted the original consideration. 3d. That the performance of the contract was enforced by the principles of moral and social obligation ; and was in strict conformity to the direction which a court of equity or of law would give to the appropriation of the fund thus ascertained. 4th. That it was not essential to the validity of the deed, that it should be proved and recorded, except as against purchasers and judgment-creditors, whose rights and interests are not in question. The following authorities were classed and cited by the counsel for Mrs. Stewart : 1 Atk. 15 ; 2 Ves. 18 ; 2 Eq. Abr. 51 *h* ; 3 Cro. Jac. 454 ; 1 Ves. jr., 196 ; 1 Dall. 193, 430 ; 1 Atk. 168 ; 2 Ibid. 519, 520 ; Ambl. 121 ; 2 Atk. 448 ; Ambl. 586 ; 1 Eq. Abr. 19 ; Bunb. 187 ; 2 P. Wms. 316 ; 1 Vent. 194 ; Cro. Jac. 158 ; Cowp. 432 ; 2 Vern. 167 ; Prec. Ch. 208 ; 1 Fonbl. 88 ; 2 Atk. 419, 420 ; 1 P. Wms. 382 ; Prec. Ch. 548 ; Ibid. 22 ; 1 Dall. 414 ; 2 P. Wms. 414 ; Ambl. 409.

The counsel for the general creditors (*E. Tilghman* and *Levy*) urged the great inconvenience and injustice of allowing a mere verbal conversation, of eighteen years' standing, to be the foundation of withdrawing from creditors, so great a mass of the debtor's apparent property. The inception of the alleged contract, is without writing, and without any witness, but the father, who was a party to it. It is admitted, however, that even a parol agreement, if fairly proved, and legally carried into effect, must prevail in Pennsylvania. But transactions, honest between the parties themselves, often become fraudulent in relation to others ; and the purest executory bargains between individuals are liable to be defeated, upon general principles of public policy, unless they are executed with strict legal publicity and form. In the present instance, everything conspires to beget caution in the admission of the widow's claim. The trust deed of 1788, makes no allusion to a subsisting contract between General Stewart and Mr. McClenachan ; nor does it make an apportionment of the fund among the widow and children. The subject of the trust was a paper medium, as negotiable by delivery as a bank-note ; and shifting, as it did, from new loan to federal stock, from stock to money, on what rational ground (considering, particularly, that General Stewart held similar certificates and similar stock in his own right), can it be sustained, that the purchase of the real estate was made with the proceeds of the identical certificates delivered on the marriage? But the settlement being made of land, it is a voluntary settlement, within the principles and the provisions of the statutes ; and it is not to be conceded, that a verbal agreement to settle certificates, constitutes a valuable consideration, *for the settlement of lands, by the ostensible owner, having become actually indebted. [*308 The deed is not only void, as it contains a clause of revocation, and cannot be regarded as a legal settlement ; but it is fraudulent, as it remained in the possession and power of the grantor. In the course of this argument, the following authorities were cited : 2 Bulst.

---

226 ; 3 Co. 81 ; 1 Burr. 475 ; 2 Vern. 510 ; 1 Atk. 168 ; 2 Ibid 481 ; 1 Ibid. 15 ; 2 Ves. 10, 11 ; 2 Vern. 510 ; 3 Co. 82 b.; 2 Freem. 236.

THE COURT (composed of McKEAN, Chief Justice, and SHIPPEN and SMITH, Justices) delivered their opinions, unanimously, in favor of the settlement ; and the jury found a verdict accordingly.

